# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNION PACIFIC RAILROAD, CO., et al., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-02-0438 |
| HEARTLAND BARGE MANAGEMENT, L.L.C., et al., | § § § | LEAD |
| Defendants. | § § | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-02-2314 |
| HEARTLAND BARGE MANAGEMENT, L.L.C., ORGULF TRANSPORT CO., AMERICAN COMMERCIAL LINES, L.L.C., PROLER SOUTHWEST, INC., GENERAL STEVEDORES, INC., *in personam*; and Barges RBL702B, OR6275, and ACL9745B, their tackle, apparel, etc., *in rem*. | § § § § § § § § § § | MEMBER |
| Defendants. | § | |

## ORDER

Pending before the Court is Defendant, Proler Southwest, Inc.'s ("Proler") Motion for New Trial/Reconsideration and/or to Alter the Court's Judgment (Dkt. #195). Having considered the arguments, applicable law, and entire record, the Court is of the opinion that the motion should be DENIED.

## Factual and Procedural Background

This consolidated admiralty action arises out of a series of allisions in the Houston Ship Channel on June 9, 2001 during Tropical Storm Allison.  The action came for trial on the merits before the Court, sitting in admiralty without a jury, on December 15, 2004.  On December 17, 2004, the evidence concluded, the parties rested, and the Court heard the arguments of counsel.  After considering the pleadings, the evidence, the arguments at trial and post-trial briefs of counsel, the Court issued Findings of Fact and Conclusions of Law (Dkt. # 192).

The Court determined during the early morning hours of June 9, 2001 two unmanned barges moored at the Proler facility broke away and caused damage to Plaintiff, Union Pacific Railroad Company's railroad bridge, and eventually allided with the Plaintiff, United States of America's ("United States") SS MOUNT WASHINGTON.  The barges' allision with SS MOUNT WASHINGTON damaged that vessel and its moor so severely that the ship broke away from and damaged Plaintiff, Port Authority of Houston's ("Port Authority") City Dock 4. After the breakaway, the SS MOUNT WASHINGTON drifted downstream and allided with two other moored ships owned by the United States, the SS EQUALITY STATE and the SS DIAMOND STATE, before finally coming to rest against the Port Authority's City Dock 15.  The Court found that the mooring of the SS MOUNT WASHINGTON was sufficient to survive the flooding if the barge breakaway and resulting allision had not occurred.

The Court concluded that Proler was negligent for failing to properly monitor the weather conditions, failing to prepare its facility and barges for the forecasted weather, and failing to have adequate, trained staff available to tend to the barges as the storm conditions worsened.  The Court determined the barges that broke away from the Proler facility were the but for and proximate cause

2

of the damages incurred by Plaintiffs Union Pacific, the United States, and the Port Authority.  The

Court entered a final judgment (Dkt. #193) awarding Plaintiffs the following relief:

1.      $147,766.00 to Plaintiff Union Pacific Railroad Company, which by agreement of
        the parties represented the amount of repairs to the railroad bridge fender system;

2.      $1,274,036.50 to Plaintiff United States of America for repairs to the SS MOUNT
        WASHINGTON, SS MOUNT EQUALITY STATE, and SS MOUNT DIAMOND
        STATE;

3.      $82,287.99 to Plaintiff Port of Houston Authority of Harris County, Texas for repairs
        to the City Docks;

4.      Prejudgment interest on the above sums from June 9, 2001 to the date of this
        judgment at the rate of 4.90% per annum together with post-judgment interest at the
        rate of 4.90% per annum; and

5.      Costs.

On October 13, 2006, Proler filed this Motion for New Trial/Reconsideration and/or to Alter the

Court's Judgment.  All Plaintiffs have filed a timely response to this motion  (Dkt. #196, #197 &

#199).

## Discussion

Proler argues that a new trial is warranted, or in the alternative, that the judgment should be

altered pursuant to Federal Rule of Civil Procedure 59.  Proler reasserts that it is entitled to

exoneration from the allision claims based on the Act of God defense.  Further, Proler claims that

Union Pacific "did not prove that the pilings protecting its railway bridge were struck by a barge

which broke away from the Proler facility as opposed to a barge which earlier broke away from

another facility."  Proler also complains that the damages asserted by the United States were

"significantly overstated" and included amounts that were not recoverable under law, such as

attorney fees and amounts that would have been incurred by the United States regardless of its ships

3

being involved in the allision.   Finally, Proler contends the Court should apply a different prejudgment interest rate.

A Rule 59(e) motion "calls into question the correctness of a judgment."   *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002).   The Fifth Circuit has held  that "such a motion is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment."   *Templet v. HydroChem, Inc*., 367 F.3d 473, 478-79 (5th Cir. 2004) (citing *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)).   Rather, Rule 59(e) "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence."   *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989) (internal quotations omitted).   Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly.   *Templet*, 875 F.3d at 479 (citing *Clancy v. Employers Health Ins. Co.*, 101 F. Supp. 2d 463, 465 (E.D. La. 2000)).

First, Proler argues that the Court erred in its application of the Act of God defense.   Proler believes it satisfied its burden and should be entitled to complete exoneration from these allision claims.   To support its argument, Proler primarily relies on the fact that on June 8, 2001, its moorings and preparations were adequate for the anticipated weather conditions.   As shipmaster, Proler had a "special duty to take all reasonable steps consistent with safety. . . to avoid or minimize the chance of harm to others."   *Boudin v. J. Ray McDermott & Co.*, 281 F.2d 81, 84–85 (5th Cir. 1960).   After weighing carefully all of the evidence, the Court concluded in its Findings of Fact and Conclusions of Law that Proler had not taken adequate precautions in light of the severe weather conditions forecasted.   Walter Keith, Proler's Plant Superindent, paid inadequate attention to the National Weather Service's Flash Flood Watch on June 8, 2001 at 11:00 a.m., which predicted "very

dangerous flooding" and  that "standing water and overflows of small streams. . . creeks. . . and bayous" would occur due to the existing saturation caused by the extensive rainfall in the preceding days.  Despite this warning, Keith found it prudent to end his workday and leave the dock at 3:30 p.m.  Had he not left early, he would have received the updated weather warnings and he could have ensured that other Proler employees remained at the facility to assist him in monitoring the barges and adjusting their lines, if necessary.

On his way home, after hearing a radio weather announcement, Keith realized the severity of the situation and sent Proler's truck driver to add two more lines onto one of the barges. The truck driver was not qualified to monitor or adjust the lines.  Later, Proler's general foreman called Keith suggesting they return to the dock.  Keith never made it back that night due to flooding.  The general foreman made it back and monitored the barges, but he too was unqualified to add or adjust lines. In fact, he did not even know where the additional lines were stored.  No facility at which barges are moored can be considered prepared for rising water unless all lines by which a barge is moored are properly adjusted to even the strain on the lines and experienced personnel are on hand to adjust the lines as the water rises.  These improvised steps taken in the last hours before the flood demonstrate that Proler did not exercise ordinary care.

As the Court pointed out in its ruling, the steps taken on June 5 to secure the Proler facility contrasted with those taken June 8 highlights Proler's failure to take all reasonable precautions.  The June 5 watch predicted less rainfall than on June 8.  And while both watches warned listeners that the bayous could overflow, the June 8 watch indicated that the grounds were already saturated and that this would affect flooding.  On June 5, Keith determined that it would be prudent to remain at the Proler facility and add extra lines to the barges in response to the June 5 weather warning.  Keith

5

did not leave Proler that night until 8:00 p.m.  In contrast, on June 8, Keith left the Proler facility at 3:30 p.m. despite the fact that the June 8 weather warning was more serious and despite the fact that he had one more barge docked at the Proler facility than he did on the night of June 5.  The Court was not convinced that Proler took all reasonable precautions by leaving the barges, without experienced personnel present, in the face of the weather forecasts and advisories broadcast on the NOAA weather radio.

Proler claims the Court made no findings as to the adequacy of its moorings on the barges that night.  Proler, however places too much weight on this factor.  Admittedly, Proler's lines held past the highest water levels that facility had ever experienced before breaking.  However, even absent any fault on the part of Proler, all the lines would have eventually broken, the mooring hardware would have given, or the barge would have sunk.  Therefore, the fact that the lines stretched and parted is not dispositive of liability in this case.  While it may have been inevitable that the barges would eventually either sink or breakaway, Proler still had a duty to display proper skill and take adequate precautions prior to the breakaway.  Proler failed to properly exercise this duty.

Contrary to Proler's contentions, the Court did make findings and took into consideration the extreme nature of the storm in relation to past storms and the precautions taken by Proler in updating its facility.  Though weather warnings citing the extreme nature of the storm were not issued until late in the evening on June 8, 2001, the 11:00 a.m. warning gave Proler adequate notice that there would be flooding. The Court also determined that beyond updating its facility, Proler could have taken additional steps to ensure safety at its facility during severe weather.  Proler's expert witness, Steven P. Weiss, testified that it was feasible, prior to June of 2001, for Proler

6

to revise its hurricane preparedness plan to provide phased responses to weather watches and warnings and to provide for the training of all personnel in how to properly take appropriate precautions. Further, Proler concedes the dock was not lighted, which precluded any personnel from adding or adjusting the lines.  Perhaps, if any of these actions were taken prior to June, 2001, the breakaways may have been avoided.

Proler contends having adequate personnel would not have prevented the breakaways and that they would not have been able to add or adjust the lines because water levels were too high by the time the severe weather watch affecting that area was issued at 12:05 a.m..  However, Proler cannot deny that had it had qualified personnel at the dock, they could have monitored the weather warnings, responded to the rising water levels, and adjusted the lines as necessary.  Proler relies on the fact that "the moor easily withstood the possible flooding noted in the 11:00 a.m. watch."  As discussed above, this statement may be true, but  the more significant problem was the lack of precautions taken thereafter. Although it was a very close call, the Court stands by its opinion that Proler failed to take "all reasonable steps necessary for safety" and therefore cannot avail itself of the Act of God defense.

Next, Proler maintains it is entitled to relief because Union Pacific failed to prove that it was one of Proler's breakaway barges that struck Union Pacific's railway bridge.  However, the evidence adduced at trial supports the Court's finding that Barge RBL702B was the most likely culprit of the damage to the railroad bridge.  On June 9, 2001, three breakaway barges passed under the Union Pacific railroad bridge.  The Court ruled out the Barge ACL9745B as causing the damage because based on the weight of the barge and the water levels at the time of its breakaway it could not have struck the fender system.  The bottom of Barge ACL9745B was in all likelihood at least one foot

above the fender system when it passed under the bridge.  Later, an eyewitness saw Proler's two breakaway barges emerge from under the railroad bridge. The two barges together measured 70 feet wide, while the opening beneath the bridge was approximately 106 feet.  It was unbelievable to the Court that these two unmanned barges could neatly pass under the bridge in raging waters without striking the fender system when tug-boat captains have a difficult time navigating a single barge under the bridge without laying up against the fender wall.  The half-loaded Barge RBL702B, which broke away from Proler's facility, weighed approximately 1000 tons and was drafting at least 8 feet in the water.  If the bow of the RBL702B came through drafting at 8 feet, it would have hit the piling system by 2 feet with a force of two million pounds.  There was further evidence that damage to the bottom of the Barge RBL702B was consistent with the damage done to the railroad bridge's piling system.  Thus, the Court stands by its opinion that this barge was the but for and proximate cause of the damage to the fender system on Union Pacific's railroad bridge.

Next, Proler argues the damages asserted by the United States were inflated and included amounts that were not recoverable under law, such as attorney fees and amounts that would have been incurred by the United States regardless of its ships being involved in the allision.  During trial the United States reduced its claim for damages omitting many of the expenses Proler claimed were not recoverable.  Thereafter, Proler did not dispute the reduced damages amount.[1]

Finally, Proler contends that the Court should alter the prejudgment interest rate to 1.4% per

---

[1] Proler stated that "[i]temization of these damages and problems with any damage filings of the U.S. Government beyond those uncollectible items it tried to submit but had to withdraw at trial will be cited in Proler's Amended Proposed Findings of Fact and Conclusions of Law which shall be filed next week."  *See* Proler's Reply to the Pre-Trial and the Post-Hearing Trial Briefs and Memo. of Pls. (Dkt. # 184), p. 22.  However, Proler never filed any such document, so the Court must assume that it had no further dispute with the damages claimed by the United States.

annum as an admission of the United States based on a breakdown of damages submitted by the United States. The damages breakdown relied upon by Proler was not presented as an exhibit to the Court, and without further information to put this alleged admission into context, the Court is inclined to exercise its discretion and uphold the prejudgment interest figure. *Karim v. Finch Shipping Co., Ltd.,* 265 F.3d 258, 275 (5th Cir. 2001). Proler has not established that this was an admission by the United States or anything more than a random estimate of prejudgment interest used by the United States in calculating its damages. Thus, the Court will not alter its ruling in this respect.

### Conclusion

The Court finds that Proler has not satisfied its burden warranting such extraordinary relief. Specifically, all of the factual allegations and legal theories asserted by Proler in its motion were available during trial and to the Court before it issued its final judgment. Accordingly, Proler has not demonstrated any reasons for this Court to grant a new trial or to justify altering or amending the judgment. For these reasons, Defendant's Motion for New Trial or to Alter or Amend Judgment is DENIED.

It is so ORDERED.

Signed this 8th day of January, 2007.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

9